**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: HON. RICHARD K. EATON**
------------------------------------------------------------------------X
ME GLOBAL, INC.                                           :
                                                         :
              Plaintiff,                                 :
                                                         :
       v.                                                :            **No. 19-cv-00179**
                                                         :
UNITED STATES,                                           :
                                                         :
              Defendant.                                 :
------------------------------------------------------------------------X

**<u>MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT</u>**

NEVILLE PETERSON LLP

John M. Peterson
Richard F. O'Neill
Patrick B. Klein
One Exchange Plaza
55 Broadway, Suite 2602
New York, NY 10006
(212) 635-2730
jpeterson@npwny.com

Dated:  October 15, 2021

## TABLE OF CONTENTS

TABLE OF CONTENTS....................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................... ii

STATEMENT OF FACTS ...................................................................................................2

I.     Description of the Subject Merchandise. ..................................................................2

II.    Relevant Tariff Provisions. ......................................................................................7

III.   Imposition of Section 232 Tariffs. ..........................................................................8

IV.   Classification Dispute: Protest, Protest Denial, Filing of CIT Action. ..............10

STANDARD OF REVIEW ...............................................................................................11

ARGUMENT .....................................................................................................................12

I.     The Grinding Rods Are Not Further Worked After Forging .............................12

II.    The Heat Treatment and Other Processing Removes the Subject Merchandise from the Scope of Heading 7228. ..........................................................................14

III.   The Use of the Imported Grinding Rods Dictates Their Classification in Subheading 7326.11, HTSUS. .............................................................................18

IV.   If the Grinding Rods Are Considered to be Described by Both Subheadings 7228.40 and 7326.11, They Are Classified in the Latter Provision by Virtue of General Rule of Interpretation 3(a). ......................................................................22

CONCLUSION...................................................................................................................24

## TABLE OF AUTHORITIES

**Cases**

*Airflow Tech. Inc. v. United States*, 31 C.I.T. 524 (2007) ............................................................ 21

*Allstar Mtg. Group LLC v. United States*, 211 F. Supp. 3d 1319 (Ct. Int'l Tr. 2017)................. 20

*Avenues in Leather, Inc. v. United States*, 178 F.3d 1241 (Fed. Cir. 1999) ................................ 23

*Bausch & Lomb, Inc. v. United States*, 148 F.3d 1363 (Fed. Cir. 1998) .............................. 11, 12

*CamelBak Products, LLC v. United States*, 649 F.3d 1361 (Fed. Cir. 2011) ........................ 18, 19

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................................................ 11

*Chevron Chem. Co. v. United States*, 59 F. Supp. 2d 1361 (Ct. Int'l Tr. 1999)........................ 12

*Cummins Inc. v. United States*, 454 F.3d 1361 (Fed. Cir. 2006) ................................................. 12

*Daw Industries Inc. v. United States*, 714 F.2d 1140 (Fed. Cir. 1983).................................... 24

*Ford Motor Co. v. United States,* 926 F.3d 741 (Fed. Cir. 2019)................................................ 19

*GRK Canada, Ltd. v. United Sates*, 761 F.3d 1354 (Fed. Cir. 2014) ................................... 19, 20

*Gustafson v. Alloyd Co.*, 513 U.S. 561 (1995)............................................................................. 20

*Jack & Jill Togs v. United States*, 47 C.C.P.A. 149 (1960).......................................................... 24

*Jarvis Clark Co. v. United States*, 733 F.2d 873 (Fed. Cir. 1984).............................................. 11

*Jewelpak Corp. v. United States*, 97 F. Supp. 2d 1192 (Ct. Int'l Tr. 2000)............................... 20

*Julius Forstmann & Co. v. United States*, 28 C.C.P.A. 222 (1940) ............................................ 24

*M. Pressner & Co. v. United States,* 42 C.C.P.A. 48 (1954)....................................................... 24

*Matsushita Elecs. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)................................ 12

*Novelty Import Co. v. United States*, 55 Cust. Ct. 169 (1965)..................................................... 23

*Pillowtex Corp. v. United States*, 171 F.3d 1370 (Fed. Cir. 1999) ............................................. 12

*Processed Plastic Co. v. United States*, 29 C.I.T. 1129 (2005) ................................................... 11

*Processed Plastic Co. v. United States*, 473 F.3d 1164 (Fed. Cir. 2006) .................................... 11

*Schlumberger Tech. Corp. v. United States*, 845 F.3d 1158 (Fed. Cir. 2017)............................ 21

*Sigma-Tau Health Science Inc. v. United States*, 838 F.3d 1272 (Fed. Cir. 2016).................... 20

*Simon Mktg. v. United States*, 29 C.I.T. 1111 (2005)................................................................. 12

*Sports Graphics, Inc. v. United States*, 24 F.3d 1390 (Fed. Cir. 1994) ...................................... 23

*Steel, Inc., v. United States*, 24 C.C.P.A. 423 (1937) .................................................. 16, 17, 21, 24

*Stella D'Oro Biscuit Co. v. United States*, 65 C.C.P.A. 52 (1978)............................................. 24

*Stella D'Oro Biscuit Co. v. United States*, 79 Cust. Ct. 28 (1977).............................................. 24

*Totes, Inc. v. United States*, 69 F.3d 495 (Fed. Cir. 1995).......................................................... 23

*United States v. Pan Pac. Textile Group Inc.*, 27 C.I.T. 925 (2003) ........................................... 12

*United States v. Simon Saw & Steel Co., Inc.*, 51 C.C.P.A. 33 (1964)........................................ 23

*Universal Electronics Inc. v. United States*, 112. F.3d 488 (Fed. Cir. 1997) .............................. 11

*Victoria's Secret Direct, LLC v. United States*, 769 F.3d 1102 (Fed. Cir. 2014)........................ 21

*WWRD USA Inc, v. United States,* 211 F. Supp. 3d 1365 (Ct. Int'l Tr. 2017) ........................... 23

*WWRD USA Inc, v. United States*, 886 F.3d 1228 (Fed Cir. 2018)............................................. 23

**Statutes**

19 U.S.C. § 1514................................................................................................................... 11

19 U.S.C. § 1862.................................................................................................... 1, 8, 10, 11

28 U.S.C. § 1581................................................................................................................... 11

28 U.S.C. § 2640................................................................................................................... 11

**Other Authorities**

Additional U.S. Note 2 to Chapter 72, HTSUS ........................................................... 13

Customs Headquarters Ruling H270254 (June 9, 2016) .............................................. 18

Explanatory Notes to Chapter 72, HTSUS ............................................................... 13

General Rule of Interpretation 1 .......................................................................... 22

General Rule of Interpretation 3 .................................................................... 22, 23

New York Customs Ruling H89317 (March 28, 2002).............................................. 14

*Notice Request for Public Comments and Public Hearing on Section 232 National Security Investigation of Imports of Steel*, 82 Fed. Reg. 19,205 (Dep't Commerce Apr. 26, 2017) ......................................................................................................... 8

Proclamation 9705 of March 8, 2018, 83 Fed. Reg. 11,625 (Mar. 15, 2018)...................... 8, 9, 10

*Publication of a Report on the Effect of Imports of Steel on the National Security*, 85 Fed. Reg. 40,202 (Dep't Commerce July 6, 2020) ...................................................... 8, 9

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: HON. RICHARD K. EATON**
-------------------------------------------------------------------X
ME GLOBAL, INC.                                       :
                                                      :
      **Plaintiff,**                            :
                                                      :
      *v.*                                     :          **No. 19-cv-00179**
                                                      :
**UNITED STATES,**                                    :
                                                      :
      **Defendant.**                           :
-------------------------------------------------------------------X

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

In accordance with Rule 56 of the Rules of the United States Court of International Trade ("USCIT R."), Plaintiff ME Global, Inc. ("ME Global" or "Plaintiff"), respectfully moves this court for an order granting summary judgment in its favor, seeking the relief sought in the Complaint. *See* ECF No. 9. Specifically, Plaintiff submits that United States Customs and Border Protection ("CBP") improperly classified the merchandise in liquidation under subheading 7228.40.00, Harmonized Tariff Schedule of the United States ("HTSUS"), assessing 25% *ad valorem duties* imposed pursuant to Section 232 of the Trade Expansion Act of 1962 ("Section 232"), as amended, 19 U.S.C. § 1862.

Plaintiff seeks summary judgment determining that the merchandise, certain heat-treated forged steel grinding rods ("the Subject Merchandise") which are imported from the People's Republic of China ("PRC" or "China") is properly classified under subheading 7326.11.00, HTSUS, as "[o]ther articles of iron or steel:. Forged or stamped, but not further worked: Grinding balls and similar articles for mills" not subject to Section 232 tariffs.

1

## STATEMENT OF FACTS

**I.    Description of the Subject Merchandise.**

As required by USCIT R. 56.3, a Statement of Material Facts Not in Dispute is submitted herewith.[1] The essential facts recited in that statement are summarized herein.

The product which is the subject of this action consists of certain steel grinding rods which are produced in China. As discussed herein, these steel rods are specially designed and processed in ways that makes them only suitable for use in rod mills which are employed in mining and mineral extraction operations.

The grinding rods are manufactured from standard blast furnace forged steel bars which plaintiff purchases from an unrelated producer in China. These untreated, or "green bars" are typically in standard factory lengths of 6 or 9 meters. Plaintiff brings these "green bars" to its joint venture manufacturing plant, ME Global Long Teng Grinding Media (Changshu) Co. Ltd. ("ME Long Teng") where they are subjected to specialized heat treatment which transforms them into grinding rods.

At ME Long Teng, the blast furnace bars undergo extensive heat-treatment which creates a unique product having a hardness profile vastly different from any raw material steel bars. First, the bars are cut to specific lengths designed to fit into a particular customer's "rod mill." The lengths are generally between 10 and 20 feet, with no more than a 0.75" tolerance allowed.

Metallurgical requirements for the imported grinding rods specify that they may contain no more than 0.025% of phosphor, no more than 0.025% of sulfur, between 0.20 and 0.40% of silicon, and 0.20 to 0.60% of chromium.

---

[1] Citations to evidence and support for the facts asserted herein are specifically included in Plaintiff's Rule 56.3 Statement of Material Facts Not in Dispute, and in the Declaration of Matthew William Schlue (dated October 15, 2021) ("Schlue Declaratoin" or "Schlue Decl."), appended herewith.

The forged steel bars which ME Global uses in its process are high carbon forged alloy steel bars that have a material hardness of 25-35 HRC (Rockwell) throughout their mass. Metallurgically speaking, the input alloy steel bars have a "pearlite" microstructure.[2]

The processing performed by ME Long Teng in China converts the blast furnace steel rods from ordinary alloy steel rods into highly specialized grinding rods for mills. The alloy steel rods are subjected to an austentizing process, in which they are heated above their critical temperatures long enough for transforming operations to take place. The steel is heated over its euctectoid temperature of 1000 degrees Kelvin (1340 Fahrenheit, 730 Celsius). The structure of the steel bar changes from ferrite to austenite, a gamma phase (y-Fe) iron structure—essentially a solid solution of steel and its alloying element. During this process, the steel is soft and ductile, can absorb considerably more carbon, and the crystalline microstructure of the steel is changed. Once a quenching process is performed, the structure of the outer layer of the steel rod is converted in large measure to martensite. Martensite is a very hard/very brittle solution of carbon in iron. It is the main constituent of hardened steel.

At ME Long Teng, the heated rods are quenched using water from ring sprayers, which causes the steel on the exterior surface to harden more quickly. As a result, the subject grinding rods imported by ME Global have a surface hardness of 50-60 HRC, and a center hardness of 35-45 HRC.

The martensite layer of the grinding rod is under high compression. About half an inch below the surface, the hardness declines to 50 HRC. The core of the grinding rod has a pearlite

---

[2] According to *Corrisionpedia,* "Pearlite" is a two-phased lamellar layered) structure composed of alternating layers of ferrite (88%) and cementite (12.) that occurs in some steel and cast irons. During slow cooling of an iron-carbon alloy, pearlite forms by a eutectoid reaction as austenite cools below 733 degrees Celsius ("the eutectoid temperature"). *See What is Pearlite? - Definition from Corrosionpedia,* available at https://www.corrosionpedia.com/definition/863/pearlite (last accessed October 15, 2021); *see also,* Roy Elliott, Cast Iron Technology 127 (1st ed. 1988).

structure with typical 35-40 HRC, which is under high tension. Such metallurgical and hardness profiles are similar to a forged grinding ball.

The heating and quenching processes create a grinding rod which has significant internal stresses. The hardness of the outer martensite layer makes the rod suitable for breaking down ores and mineral structures; the relative softness of the inner pearlite layer provides ductility which prevents the bars from shattering while in use in the mill.

Because of the tensions created within the grinding rods by these processing operations, each grinding rod, after production, is stored for one week and thereafter individually undergoes ultrasonic testing to ensure there are no defects which could result in catastrophic failures, which could cause injury or death (*e.g.,* if a 600-800 pound grinding rod were to catastrophically fail, shatter and be projected through the air). Only after this waiting period and passing ultrasonic testing ("UT Test"), are the grinding rods readied for shipment to customers.

Only after this highly technical and specialized processing is the resultant grinding rod recognizable as a new and distinct article of commerce. After this entire process is complete, the grinding media industry would recognize the subject grinding rods and place orders for their dimensionally specific mills. The grinding rods are sold for approximately 30-40% more than an ordinary forged alloy steel rod. The grinding rods' sole use in commerce is as grinding media for a rod mill; each grinding rod must be made to the precise dimensions accommodated by the mill in which it will be used.

Grinding mills are extensively used in mining and other mineral extraction operations to separate ore materials and allow for the recovery of valuable metals, such as gold, copper, silver or iron. There are two major types of grinding mills in the mining industry: ball mills[3] and rod

---

[3] The processes by which grinding balls are made are essentially the same as that for grinding rods. Alloy steel is forged into a ball shape, and undergoes the similar austenization and quenching processes which yield a

mills. ME Global's customers are processors in the mineral industry who operate wet grinding rod and ball mills for hard rock mining applications.

A grinding mill crushes input materials (*e.g.*, iron ore) by tumbling them within a cylinder alongside consumable grinding balls or grinding rods. The large cylinder's slow tumbling rotation (typically between 4 to 20 revolutions per minute) causes the grinding media (*i.e.*, grinding balls or rods) to move up the sides of the cylinder and then crash back down onto the input material, constantly pulverizing it into a finer composition. The figures below depicts the operation of a rod mill (left) and a ball mill (right):

 

To operate effectively within a grinding mill, grinding rods and balls must have a high surface hardness, and a slightly lower core hardness. These characteristics enhance the resilience of the media and reduce their consumption within the mill.

Most milling operations are "wet milling" operations, in which water is pumped into the mill to reduce friction and help move the crushed ore toward sieves of specified mesh diameters.

---

dynamic body with a hard outer surface of martensite and a softer inner core or pearlite. The structure of the ball is under considerable internal tension. This structure allows the grinding ball to shatter ores and other materials, while the inner ductility extends the sphere's useful life.

Particles crushed to the appropriate mesh size are carried out of the mill for materials recovery, while larger particles remain in the mill for further crushing.

A typical rod mill design is shown below:



Rod mills are suitable for coarse crushing and grinding of feed materials, whereas ball mills are typically used for finer milling operations. The hardness of the heat-treated grinding rods prevents them from bending or deforming, which could lead to a tangling of the rods. To prevent the conditions leading to rod charge tangling, the length to diameter ratio is maintained at 1.4 to 1.6. Rod mills accept feed up to about 50 mm (2 in.) and produce a product in the size range of 3000 to 270 microns. As indicated, grinding action is by line contact between the rods extending the length of the mill. Rods tumble and spin in roughly parallel alignment simulating a series of roll crushers. This results in the desired grinding of coarse material and minimizes production of slimes.

Rod mills operate at lower speed than ball mills because the rods are rolled and not cascaded. For an equivalent grind, a rod mill uses less steel than would be required in a ball mill

due to the lower speed and better contact between the media and ore. The rod charge[4] in a mill must be maintained in good working condition—broken and worn rods must be removed. It is critical that the rods stay essentially parallel to one another. If rods become misaligned, grinding action is lost and, more seriously, rod tangles occur. The maximum length of a grinding rod is limited to about 20 feet. This in turn limits the length, diameter, and capacity of rod mills.

The properties which distinguish grinding rods for mills from other steel rods include (i) additional heat treatment to impart strength needed for crushing; (ii) ratio of hardness of outer surface to core, which produces a specially designed tension within the rod; and (iii) specific sizing of the rod for use in particular types of mills.

Grinding rods sell at a premium compared to non-hardened steel rods. They must be engineered and designed to use with specific models of grinding mills. There are only a few customers in the United States for these types of grinding rods.

## II.    Relevant Tariff Provisions.

| Heading/ Subheading | Stat. Suffix | Article Description |
|---|---|---|
| 7228 | | Other bars and rods of other alloy steel; angles, shapes and sections, of other alloy steel; hollow drill bars and rods, of alloy or nonalloy steel: |
| | | *      *      * |
| 7228.40 | | Other bars and rods, not further worked than forged |
| **Heading/ Subheading** | **Stat. Suffix** | **Article Description** |
| 7326 | | Other articles of iron or steel |
| | | Forged or stamped, but not further worked: |
| 7326.11 | | Grinding balls and similar articles for mills |
| 7326.19 | | Other |

---

[4] Rod mills normally carry 35 to 65% rod charge by volume. The limits on charge level are (i) keeping the feed end trunnion open so that feed will get into the mill; and (ii) keeping the rod charge low so rods will not work their way into discharge openings where they can cause rod tangling.

While goods classified under these provisions are typically duty free, at times relevant to the entry at bar, goods classified under subheading 7228.40.00. HTSUS, were at the time of entry, subject to a National Security Tariff of 25% *ad valorem*, imposed under Section 232. As explained below, classification of the merchandise under the HTSUS determines the applicability of the Section 232 tariff. Consequently, this case does present a justiciable case or controversy. *See 3V Inc. v. United States*, 23 C.I.T. 1047, 1049-52 (1999).

### III.   Imposition of Section 232 Tariffs.

Section 232, 19 U.S.C. § 1862, empowers the President to adjust imports of articles that may threaten to impair the national security of the United States. Here, on April 19, 2017, the Secretary initiated a Section 232 investigation to determine the effects of steel imports on national security. *See Notice Request for Public Comments and Public Hearing on Section 232 National Security Investigation of Imports of Steel*, 82 Fed. Reg. 19,205, 19,205 (Dep't Commerce Apr. 26, 2017). The product scope of the investigation covered "steel mill products … which are defined at the Harmonized System ("HS") 6-digit level as: 720610 through 721650, 721699 through 730110, 730210, 730240 through 730290, and 730410 through 730690, including any subsequent revisions to these HS codes." *See Publication of a Report on the Effect of Imports of Steel on the National Security*, 85 Fed. Reg. 40,202, 40,209 (Dep't Commerce July 6, 2020) (an investigation conducted under [Section 232]) ("Steel Report").

On January 11, 2018, the Secretary delivered the report to the President. *See* Proclamation 9705 of March 8, 2018, 83 Fed. Reg. 11,625, 11,625 (Mar. 15, 2018) ("Proclamation 9705"); *see also* Steel Report, 85 Fed. Reg. 40,202. The Steel Report "conclude[d] that the present quantities and circumstance of steel imports are 'weakening our internal economy' and threaten to impair the national security as defined in Section 232[,]" 85 Fed. Reg. at 40,204, and recommended that the

President "impose a [63 percent] quota or [24 percent] tariff on all steel products covered in this investigation imported into the United States[.]" *Id*. at 40,205. "In selecting an alternative," the Steel Report also advised that "the President could determine that specific countries should be exempted from the proposed 63 percent quota or 24 percent tariff … based on an overriding economic or security interest of the United States." *Id*. at 40,226.

On March 8, 2018, within ninety days of receiving the report, the President issued Proclamation 9705. *See* 83 Fed. Reg. at 11,625, 11,628. Concurring with the Secretary's findings, the President announced a 25 percent *ad valorem* tariff on steel articles "imported from all countries except Canada and Mexico." *Id*. at 11,626 ¶ 8. Proclamation 9705 states that, except as otherwise provided, "all steel articles imports specified in the Annex shall be subject to an additional 25 percent *ad valorem* rate of duty[.]" *Id*. at 11,627 cl. 2.

The President implemented the tariffs by modifying Subchapter III of Chapter 99 of the HTSUS to add a new note and a new tariff provision under the Heading 9903.80.01. *Id*. at 11,627 cl. 2; *see also id*. at 11,629–30 (Annex to modify Chapter 99 of the [HTSUS]). Namely, the Annex added Note 16 to Subchapter III of Chapter 99, which provides, in relevant part, the following:

(a) Heading 9903.80.01 sets forth the ordinary customs duty treatment applicable to all entries of iron or steel products from all countries, except products of Canada and of Mexico, classifiable in the headings or subheadings enumerated in this note. Such goods shall be subject to duty as provided herein. No special rates of duty shall be accorded to goods covered by heading 9903.80.01 under any tariff program enumerated in general note 3(c)(i) to the tariff schedule. All anti-dumping, countervailing, or other duties and charges applicable to such goods shall continue to be imposed.

(b) The rates of duty set forth in heading 9903.80.01 apply to all imported products of iron or steel classifiable in the provisions enumerated in this subdivision:

   (i) flat-rolled products provided for in headings 7208, 7209, 7210, 7211, 7212, 7225 or 7226;

     (ii) bars and rods provided for in headings 7213, 7214, 7215, 7227, or 7228, angles, shapes and sections of 7216 (except subheadings 7216.61.00, 7216.69.00 or 7216.91.00); wire provided for in headings 7217 or 7229; sheet piling provided for in subheading 7301.10.00; rails provided for in subheading 7302.10; fish-plates and sole plates provided for in subheading 7302.40.00; and other products of iron or steel provided for in subheading 7302.90.00;

     (iii)tubes, pipes and hollow profiles provided for in heading 7304, or 7306; tubes and pipes provided for in heading 7305.

     (iv)ingots, other primary forms and semi-finished products provided for in heading 7206, 7207 or 7224; and

     (v) products of stainless steel provided for in heading 7218, 7219, 7220, 7221, 7222 or 7223.

*See* Proclamation 9705, 83 Fed. Reg. at 11,629 (Annex).

Accordingly, as applied to the above-mentioned relevant tariff provisions, merchandise imported into the United States from China classified under subheading 7228.40 became subject to the additional 25% *ad valorem* Section 232 tariffs on March 22, 2018, and remain subject thereto. Meanwhile, merchandise imported into the United States from China classified under subheading 7326.11 never became subject to the additional 25% *ad valorem* Section 232 tariffs.

## IV.    Classification Dispute: Protest, Protest Denial, Filing of CIT Action.

The steel grinding rods were liquidated by CBP under subheading 7228.40.00, HTSUS, which provides for "[o]ther bars and rods of other alloy steel; angles, shapes and sections, of other alloy steel; hollow drill bars and rods, of alloy or non-alloy steel: other bars and rods, not further worked than forged." The grinding rods were assessed with regular duties at a rate of free, and assessed with 25% *ad valorem* tariffs pursuant to Section 232. *See e.g.,* 19 U.S.C. § 1862.

Plaintiff timely protested the classification of its grinding rods in liquidation, asserting that the goods were more properly classified under subheading 7326.111.00, HTSUS, which provides

for "[o]ther articles of iron or steel: Forged or stamped, but not further worked: Grinding balls and similar articles for mills." *See e.g.,* 19 U.S.C. § 1514. At relevant times goods so classified were unconditionally duty free and were not subject to Section 232 tariffs.

CBP denied Plaintiff's protest on March 13, 2019. Thereafter, Plaintiff timely filed this action to contest the denial of its protest. *See* Summons (ECF No. 1). This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1581(a).

## **STANDARD OF REVIEW**

CBP's classification is subject to *de novo* review pursuant to 28 U.S.C. § 2640. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See* USCIT R. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

This Court may resolve a classification issue by means of summary judgment. *See Bausch & Lomb, Inc. v. United States*, 148 F.3d 1363, 1365 (Fed. Cir. 1998) (reviewing CBP's classification decision *de novo* on the record made before it, 28 U.S.C. § 2640(a)(1)); *see also, Processed Plastic Co. v. United States*, 29 C.I.T. 1129, 1130 n.4 (2005), *aff'd*, 473 F.3d 1164 (Fed. Cir. 2006). Where there is no genuine dispute as to any material fact, such as on motion for summary judgment, CBP will not receive the benefit of a presumption of correctness. *Id*. at 1131, n.5; *see also Universal Electronics Inc. v. United States*, 112. F.3d 488, 491 (Fed. Cir. 1997).

As with all classification issues, fundamentally "[t]he court's duty is to find the correct result," *Jarvis Clark Co. v. United States*, 733 F.2d 873, 878 (Fed. Cir. 1984) (emphasis in original), and thus, the ultimate question is "whether the merchandise is properly classified under

one or another classification heading." *Simon Mktg. v. United States*, 29 C.I.T. 1111, 1117 (2005) (citation omitted).

Determining the correct classification of merchandise entails a two-step process where the court first construes the relevant classification headings—a purely legal question—and second, the court determines under which of the properly construed tariff terms the merchandise at issue falls. *Bausch & Lomb*, 148 F.3d at 1365; *Pillowtex Corp. v. United States*, 171 F.3d 1370, 1373 (Fed. Cir. 1999). Where the nature of the merchandise is not at issue, the question collapses entirely into a question of law ripe for disposition on summary judgment. *Cummins Inc. v. United States*, 454 F.3d 1361, 1363 (Fed. Cir. 2006) (citations omitted).

In determining whether a genuine issue of fact exists, the court reviews the evidence submitted and draws all inferences against the nonmoving party. *United States v. Pan Pac. Textile Group Inc.*, 27 C.I.T. 925, 927 (2003); *see also, Matsushita Elecs. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). But even if there are "differences in the factual positions advanced by each party," summary judgment remains appropriate unless there are "genuine issues of material fact in dispute." *Chevron Chem. Co. v. United States*, 59 F. Supp. 2d 1361, 1363 (Ct. Int'l Tr. 1999).

## ARGUMENT

## I.    The Grinding Rods Are Not Further Worked After Forging

The two competing tariff provisions share a common requirement that after the product is forged, it cannot be "further worked." As an initial matter, ME Global notes that its post-forging heat treatment operations do not constitute further working, as that concept is defined in the tariff.

While both subheadings 7228.40, HTSUS and 7326.11, HTSUS employ the concept of "not further worked," the restriction against further working appears to be stricter for goods of subheading 7228.40 than for goods of subheading 7326.11.

The concept of "not further worked" beyond forging is explained in Additional U.S. Note 2 to Chapter 72, HTSUS, which states:

> **For the purposes of this chapter**, unless the context provides otherwise, the term "further worked" refers to products subjected to any of the following surface treatments: polishing and burnishing; artificial oxidation; chemical surface treatments such as phosphatizing, oxalating and borating; coating with metal; coating with nonmetallic substances (*e.g.*, enameling, varnishing, lacquering, painting, coating with plastics materials); or cladding.

On the other hand, the Explanatory Notes to the Harmonized System nomenclature contain a special "Subheading Note" applicable to subheadings 7326.11 and 7326.19, which provides:

> After forging or stamping, the products of these subheadings may have been subjected to the following working or surface treatments:
>
>> Removal of burrs, runouts and other stamping defects by rough burring, grinding, hammering, chiseling or filling; removal of annealing by acid dipping; simple sand-blasting; roughing or rough bleaching and other operations intended exclusively to detect flaws in the metal; application of rough coatings of graphite, oil, tar, red lead or similar products, clearly intended to protect the subjects against rust or other types of oxidation; stamping, punching, printing, etc., with simple inscriptions, such as trademarks.

Explanatory Notes to Chapter 72, HTSUS. Under either HTSUS Chapter, however, subjecting forged rods to heat treatment to increase hardness does not fall within the definition of the term "further worked." Thus, for example, in a Customs Ruling concerning the classification of "grouser bars," CBP wrote:

> You ask whether heat-treating is a process that advances the grouser bars beyond the stage of a basic mill product classifiable in Chapter 72. Part (IV)(C)(2) of the General Explanatory Notes to Chapter 72 state that finished products of this chapter may be subjected to further finishing treatments to improve the properties or appearance of the metal, protect it against rusting, etc. The EN's further state that

13

> "Except as otherwise provided in the text of certain headings, such treatments do not affect the heading in which the goods are classified. They include: (a) Annealing, hardening, tempering, case-hardening, nitriding and similar heat treatments to improve the properties of the metal."

*See* New York Customs Ruling H89317 (March 28, 2002).[5] CBP specifically envisions post-forging heat treatments and hardening operations may occur, even if they are designed to improve the properties of the metal, without such operations being considered a "further working" of the steel.

Accordingly, while ME Global's grinding rods are subjected to hardening operations through heat treatments, those treatments do not constitute a "further working" of the steel after forging, and would not preclude the rods from being classified under either subheading 7228.40 or 7326.11, HTSUS. However, other factors remove the grinding rods from subheading 7228.40.

## II.    The Heat Treatment and Other Processing Removes the Subject Merchandise from the Scope of Heading 7228.

Heading 7228, HTSUS, covers "other bars and rods of alloy steel." The Explanatory Notes to that Heading incorporate the Explanatory Notes to Headings 7214 through 7216. Those Explanatory Notes describe the additional operations which may be performed to steel bars and rods. They are relatively limited in character, and include such surface operations as descaling, picking, and other processes to remove oxide crust and scale, rough coating to protect products from rust or other oxidation, and removal of small parts of metal for testing.

Additional processing operations are allowed, as noted in the Explanatory Notes to Heading 7215, provided that, as a result of those operations, the bars or rods **"do not assume the character of articles or products falling in another heading."** (Emphasis added). But that is

---

[5] Customs rulings are entitled to judicial deference to the extent they have the "power to persuade," see *Mead Corp. v. United States*, 533 U.S. 218, 235 (2001), citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).

precisely what occurs here. By virtue of the austenitizing, cooling and other temperature-treatment operations, the cutting of the bars to mill-specific length, and the saw cuts at the rod end, the grinding rods at bar acquire unique metallurgical properties not typically found in steel bars and rods. These characteristics include a significantly increased surface hardness through intentional processing that creates an important differential between surface hardness and core hardness, and the intentional introduction and creation of internal stresses[6] in the grinding rods which make them suitable for use in mining operations. This differential in the rods' hardness, the outer surfaces of the rods can smash rocks and ores while maintaining the ductility needed to avoid breaking in the mill. The additional operations performed at ME Long Teng change the steel rods from having the character of "steel mill products" to those of a manufactured article dedicated to a specific (and exclusive) use.

There can be no question that, by virtue of these operations, the instant merchandise has "assumed the character of articles or products falling in another heading" of the tariff, in this case Heading 7326, and, specifically subheading 7326.11, HTSUS, which provides for "Grinding balls and similar articles used in mills." Indeed, the record demonstrates that the subject grinding rods are advertised as "ME Grinding Rods" and that they are advertised as "Grinding Media/Premium Quality Grinding Rods. *See* Schlue Decl. at ¶¶ 3, *id.* at Exhibit C (Plaintiff's Responses to Defendant's First Requests for Production: RFP Ex. B (ME Elecmetal: Grinding Media (Brochure)). They are produced to tight dimensional tolerances corresponding to the dimensions of the customer's mill, with an allowed variance of only +/- 0.75" for rods which are between 10 and 20 feet long and that the rod ends are "normalized" or "not heat treated" *See* Schlue Decl. at

---

[6] By introducing and inducing tensions in the grinding rod between the outer hardness and the core hardness, the production process creates an article which has the potential to shatter in a catastrophic manner (This is not unlike the situation for, *e.g.,* glass shower doors and enclosures, where tensions within the glass body caused by the creation of stresses during the glass tempering process, can sometimes cause sudden failure of the glass).

¶¶ 3, *id.* at Exhibit D (Plaintiff's Responses to Defendant's First Requests for Production: RFP Ex. C (ME Elecmetal: Grinding Rod Product and Processing)). They are sold exclusively for use in rod-type grinding mills, and they are known universally throughout the industry as "grinding rods."

Because of the potential for catastrophic failure, ME Global carefully controls the manufacturing process to prevent the introduction of hydrogen impurities. *Id.* "The raw material requirement for heat treated grinding rods is of great importance to the safety and survivability of the product. Hydrogen embrittlement in grinding rods has to be taken seriously as a broken rod segment can travel with velocity in an uncontrolled manner." Thus, "[a]fter the rods have been heat treated, they must be placed in inventory for a minimum of one week before ultrasonic inspection." *Id.* Following the week-long storage, all of the rods are ultrasonically tested to detect any impurities which might cause their rejection. *See* Schlue Decl. at ¶¶ 3, *id.* at Exhibit J (Plaintiff's Responses to Defendant's First Requests for Production: RFP Ex. K (UT Tester Instructions)). ME Long Teng issues a Quality Inspection Certificate for each batch of grinding rods produced. *See* Schlue Decl. at ¶¶ 3, *id.* at Exhibit E (Plaintiff's Responses to Defendant's First Requests for Production: RFP Ex. D (ME Long Teng Grinding Media (Changshu) Co., Ltd.: Quality Inspection Certificate)).

The processing by ME Long Teng causes "green bars" to be processed into a new and different article more properly classified in subheading 7326.11, HTSUS. The resulting article is "similar to" "grinding balls" and which are also designed—exclusively—for use in mills.

The classification of grinding balls—the articles now identified by name in subheading 7326.11, HTSUS—under an earlier tariff schedule was considered by the Court of Appeals in *Steel, Inc., v. United States*, 24 C.C.P.A. 423, 424 (1937), in which the Court held that the

metallurgical properties and dedicated use of the grinding balls took them outside the scope of a tariff provision for "steel forgings," and caused them to be classified as "parts of machines." The Court noted the unique and sole function of the grinding balls:

> It is established that the steel balls here involved are used solely in grinding mills for the purpose of pulverizing ore or cement. The mills in which the balls are used consist of an outer cylindrical shell, fitted with gears and a motor to revolve it. In the wall of the shell is an opening about sixteen by eighteen inches through which the balls are placed in the shell. They are not attached to the shell. When the ore is introduced into the shell and the shell is caused to revolve, the ore and steel balls come into contact with each other, so that the ore is crushed or pulverized.

*Id.* Trial testimony, noted by the Appellate Court, also pointed out the essential similarity of grinding "rod mills" and grinding "ball mills," stating:

> Q. Have you seen anything else used in those ball mills, besides steel balls, such as the ball I have in my hand, and which I now present as Exhibit 1?
>
> A. Yes, sir; they use rods. I have seen them used in the same mills. They also use rock. This rock is imported, generally, from Sweden or Denmark. It is very hard rock, and they use that for grinding purposes.
>
> Q. They do use something else besides these balls in the grinding mills you described?--A. You can use rock or rods instead of the balls. I want to qualify that. The mill that the rods are used in, is a little different in design than the mill the balls are used in.
>
> Q. And how about the rock?--A. The rock is used in the same mill. They can use the rock instead of the balls.

*Id. at* 425. Thus, more than 80 years ago, the courts recognized the essential similarity, in construction and use, of grinding balls and grinding rods.[7]

---

[7] In *Steel, Inc.*, the grinding balls were held to be classifiable under a tariff provision for "parts of machines." The HTSUS, however, has a specific provision for at subheading 7326.11. "Grinding balls and similar articles for mills," and Additional U.S. Rule of Interpretation 3, HTSUS, provides that "a provision for parts of an article covers products solely or principally used as a part of such articles but a provision for '"parts"' or '"parts and accessories"' shall not prevail over a specific provision for such part or accessory." *See* Additional U.S. Rule of Interpretation 3, HTSUS.

The processing of the "green" steel rods to produce grinding rods, with a distinct commercial designation and singular use, moves these items out of Heading 7228, and into subheading 7326.11, HTSUS. In this regard, the use of the grinding rods is determinative of their classification.

### III. The Use of the Imported Grinding Rods Dictates Their Classification in Subheading 7326.11, HTSUS.

While an *eo nomine* provision typically covers all forms of a named article, where something is *more than*, or *different than*, the thing described in a tariff provision—and the *difference is significant*—the article no longer falls within that provision. *See e.g., CamelBak Products, LLC v. United States*, 649 F.3d 1361, 1367-68 (Fed. Cir. 2011). In analyzing whether an article has been so processed or advanced as to be removed from a tariff provision, various factors are considered. As noted in Customs Headquarters Ruling H270254 (June 9, 2016):

> When analyzing what falls within the scope of an *eo nomine* provision, the courts have advised that there are certain factors that provide guidance. The relevant factors in this case are "design and use/function of the subject articles" as well as commercial factors such as "how the subject articles are regarded in commerce" and "how the subject articles are described in sales and marketing literature."

In the instant case, ME Global's products are specially designed to have a unique metallurgy and a differential in hardness between the outer surface and the core. They have a single function—to be used in mills to break down ores and other materials—just as a grinding ball is. The subject articles are regarded in commerce as grinding rods, and nothing else—the internal tensions make them unsuitable for construction or other load-bearing applications. In terms of commercial factors, the articles are regarded in commerce as "grinding rods" and as "grinding media." They are so described in sales and marketing literature.

Building on the "more than" doctrine of *CamelBak, supra,* recent Federal Circuit decisions have noted that "under certain circumstances use may be of 'paramount importance' in guiding

the court towards the proper commercial meaning of a term." *GRK Canada, Ltd. v. United Sates*, 761 F.3d 1354, 1358 (Fed. Cir. 2014) (emphasis added). This is particularly the case when "the use of the subject articles" is such "an important aspect of their identity." *Id.* "In such a case, the court's inquiry includes the subject article's physical characteristics, as well as what features the article has for typical users, how it was designed and for what objectives, and how it is marketed." *Id.*

More recently in *Ford Motor Co. v. United States,* 926 F.3d 741, 750 (Fed. Cir. 2019), *cert. den.* 141 S. Ct. 179 (2020), the Federal Circuit held that:

> Generally, a use limitation should not be read into an *eo nomine* provision. However, doing so may be appropriate where the name itself inherently suggests a type of use. Alternatively, once tariff terms have been defined, use of the subject articles may define an article's identity when determining whether it fits within the classification's scope.

Here, the subject merchandise is clearly used as "grinding rods." The grinding rods fit precisely into the scenario described by the Appellate Court in *Ford* and *GRK Canada, supra*. While the unique heat treatments performed to transform the forged steel bar into a grinding rod may not cause the bar to be considered "further worked," they do transform the bar into a unique article—a grinding rod—with a single use as grinding media in a grinding rod mill. These grinding rods have a commercial designation as such, which is used universally in the industry. *See* Schlue Decl., at ¶ 24. The use as a grinding rod imparts the goods' entire identity and only possible use (*i.e.,* in a grinding rod mill).

Importantly, the text of subheading 7326.11, HTSUS, inherently suggests that the products classified under its scope are for a particular type of use as a grinding ball or similar object.

This aligns with *CamelBak, supra*, 649 F.3d at 1368, where the Federal Circuit noted "how the subject articles are regarded in commerce" and "how the subject articles are described in sales

19

and marketing literature," and how these considerations can "guide the court's assessment of whether articles fall within the scope of an *eo nomine* provision. Cf. *Sigma-Tau Health Science Inc. v. United States*, 838 F.3d 1272, PIN (Fed. Cir. 2016) (holding that commercial designation is not useful in classification when there is no consensus). Similarly, in *Allstar Mtg. Group LLC v. United States*, 211 F. Supp. 3d 1319, 1332-33 (Ct. Int'l Tr. 2017), this Court relied on the Federal Circuit's *GRK Canada* decision, *supra*, agreeing that a product's use is relevant to a classification determination where: "(1) the use of the subject article is an important aspect of its identity, and consequently the article's classification; or, as relevant here, when (2) "determining whether [the subject article] fits within the classification's scope." *Id.*

As noted above, the subject grinding rods have a single use as grinding media in a rod mill. The grinding rods' extensive heat treatment, introduction of internal stresses, straightening, notching and manufacture to tight tolerances. It cannot be denied that the use of the article is an all-encompassing aspect of its identity. Consideration of the use of the article also indicate that it is properly classified under subheading 7326.11, HTSUS. It is a "similar" article to the "grinding balls" mentioned explicitly in the subheading, and it is intended for precisely the same use ("for mills"). If there was any doubt that the subject grinding rods are "similar articles" to "grinding balls" specified in subheading 7326.11, HTSUS, that doubt can be dispelled by the canon of statutory construction *noscitur a sociis*, and the canon of *ejusdem generis*, which is an exemplar of the *nosictur a sociis* rule.

*Noscitur a sociis* means that "[a] word is known by the company it keeps." *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995); *see also Jewelpak Corp. v. United States*, 97 F. Supp. 2d 1192, 1996 (Ct. Int'l Tr. 2000); *X-Acto Crescent Prods. v. United States,* 27 Cust. Ct. 190, 191 (1951). *Ejusdem generis* ("of the same kind") is viewed as a specific application of the *noscitur*

rule,[8] used when "general words follow an enumeration of specific items, [such that] the general words are read as applying only to other items akin to those specifically enumerated." *Schlumberger Tech. Corp. v. United States*, 845 F.3d 1158, 1165 n.8 (Fed. Cir. 2017).

In the instant case, subheading 7326.11, HTSUS contains a single exemplar—"grinding ball"—modified by the phrase "and similar articles." Subheading 7326.11 also features a limitation that the merchandise be used "for mills." As noted in *Victoria's Secret Direct, LLC v. United States*, 769 F.3d 1102, 1107 (Fed. Cir. 2014), "[a]pplying the phrase 'and similar articles' to the merchandise at issue, then, requires determining whether the merchandise, considering all of its features, shares the unifying characteristics of the particular heading." *Id.* That grinding rods have an identical purpose as grinding balls, and an essential similarity, was acknowledged more than 80 years ago in *Steel Inc., supra.* Moreover, the grinding rods meet the limitation set out in subheading 7326.11, HTSUS—they are manufactured specifically "for mills" according to the mills' specific tolerance. This is therefore a case where "[t]he unifying characteristics may consist of both affirmative features and limitations." *Victoria's Secret*, 769 F.3d at 1107.

Thus (i) the unique processing which the instant grinding rods undergo remove them from Heading 7228, HTSUS, giving them the character of a good classified under a different Heading; (ii) the use of the grinding rods, being an essential part of their identity, is an essential consideration in their classification; and (iii) the grinding rods are "similar articles" of a kind described in subheading 7326.11, HTSUS, sharing not only common uses and characteristics with the specifically identified products in the heading (grinding balls), but also sharing the subheading's limitation, as they are designed exclusively "for mills."

---

[8] *See e.g., Airflow Tech. Inc. v. United States*, 31 C.I.T. 524, 533 (2007).

**IV.    If the Grinding Rods Are Considered to be Described by Both Subheadings 7228.40 and 7326.11, They Are Classified in the Latter Provision by Virtue of General Rule of Interpretation 3(a).**

If one assumes, however, that the grinding rods are described *prima facie* by the language in both subheadings 7228.40 and 7326.11, and cannot be classified pursuant to General Rule of Interpretation ("GRI") 1, the analysis must proceed beyond GRI 1 and additional GRI's must be applied. GRI 2 does not apply in the instant case. However, GRI 3 applies, stating:

> 3. When, by application of rule 2(b) or for any other reason, goods are, *prima facie*, classifiable under two or more headings, classification shall be effected as follows:
>
> (a) The heading which provides the most specific description shall be preferred to headings providing a more general description. However, when two or more headings each refer to part only of the materials or substances contained in mixed or composite goods or to part only of the items in a set put up for retail sale, those headings are to be regarded as equally specific in relation to those goods, even if one of them gives a more complete or precise description of the goods.
>
> (b) Mixtures, composite goods consisting of different materials or made up of different components, and goods put up in sets for retail sale, which cannot be classified by reference to 3(a), shall be classified as if they consisted of the material or component which gives them their essential character, insofar as this criterion is applicable.
>
> (c) When goods cannot be classified by reference to 3(a) or 3(b), they shall be classified under the heading which occurs last in numerical order among those which equally merit consideration.

Subheading 7326.11, HTSUS is clearly the more specific provision covering the grinding rods, because it (i) describes the goods; and (ii) characterizes the merchandise by use. Grinding rods are "similar articles" to grinding balls, which are provided for *eo nomine* in the subheading. A grinding rod has the similar metallurgical composition, the similar internal tensions, and precisely the same use in mills. They share the same essential characteristics as the specifically named good—"grinding balls." It is difficult to conceive of a tariff provision which could more

accurately describe them. By contrast, subheading 7228.40, HTSUS is a more general provision

which describes all forged steel rods, irrespective of use.

In determining what is contained in a provision for "similar articles," CBP and the courts

are guided by the interpretive rule *ejusdem generis*. As noted in *WWRD USA Inc, v. United States*:

> In classification cases, the statutory construction rule of *ejusdem generis* ("of the
> same kind") requires that the subject imports "possess the essential characteristics
> or purposes that unite the articles enumerated *eo nomine* in order to be classified
> under the general terms."

211 F. Supp. 3d 1365, 1376 (Ct. Int'l Tr. 2017) (citing *Sports Graphics, Inc. v. United States*, 24

F.3d 1390, 1392 (Fed. Cir. 1994)), *aff'd*, 886 F.3d 1228 (Fed Cir. 2018). "In classification cases,

*ejusdem generis* requires that . . . the merchandise must possess the same essential characteristics

or purposes that unite the listed examples preceding the general term or phrase." *Avenues in*

*Leather, Inc. v. United States*, 178 F.3d 1241, 1244 (Fed. Cir. 1999) (citing *Totes, Inc. v. United*

*States*, 69 F.3d 495, 498 (Fed. Cir. 1995)). "Classification … is appropriate only if the imported

merchandise shares the characteristics or purpose and does not have a more specific primary

purpose that is inconsistent with the listed exemplars." *Avenues in Leather*, 178 F.3d at 1244

(citations omitted).

GRI 3(a) codifies the long-established rule of "relative specificity," which holds that an

article described in two or more tariff provisions must be classified in the provision which most

specifically describes it. *See United States v. Simon Saw & Steel Co., Inc.*, 51 C.C.P.A. 33, 40

(1964). The courts have laid down a number of principles to guide the application of the rule of

relative specificity. *See Novelty Import Co. v. United States*, 55 Cust. Ct. 169, 173-74 (1965). In

this regard, where an article is described in both an *eo nomine* provision (such as subheading

7228.40, HTSUS) and a provision which classifies by use (such as subheading 7326.11, HTSUS),

the use provision is generally considered to be the more relatively specific. *See e.g.*, *Julius*

*Forstmann & Co. v. United States*, 28 C.C.P.A. 222, 227 (1940); *M. Pressner & Co. v. United States,* 42 C.C.P.A. 48, 49 (1954)*; Jack & Jill Togs v. United States*, 47 C.C.P.A. 149, 151 (1960).

Where one tariff provision implies the use of a product, it is generally considered to be more specific than a competing provision describing the goods as a class. *See e.g.*, *Stella D'Oro Biscuit Co. v. United States*, 79 Cust. Ct. 28, 32 (1977), *aff'd*, 65 C.C.P.A. 52 (1978). Thus, while sheaths for amputees were described by the term "wearing apparel," they were deemed to be more properly classified under a tariff provision for "other prosthetic articles." *Daw Industries Inc. v. United States*, 714 F.2d 1140, 1144 (Fed. Cir. 1983).

Of course, the master rule of statutory construction is that the tariff be interpreted to as to carry out the intent of the legislature. Clearly, in enacting subheading 7326.11, HTSUS, Congress intended to put "grinding balls" and "similar articles" which are "for use in mills" into a specific tariff provision. Grinding rods are "similar" to grinding balls in composition and use and are also "used in mills." The instant merchandise satisfies all requirements for classification in subheading 7326.11, HTSUS.

That grinding media is something more significant than merely a steel forging was established in *Steel, Inc. v. United States*, 24 C.C.P.A. 423 (1937), discussed *supra*. The language of subheading 7326.11, HTSUS, is relatively more specific than that of subheading 7228.40, HTSUS. This is the provision which describes the grinding rods at issue.

## **CONCLUSION**

For the reasons set forth herein, Plaintiff ME Global Inc. respectfully submits that summary judgment should be entered in its favor, classifying the subject goods under HTS subheading 7326.11.

Respectfully submitted,

/s/ John M. Peterson
John M. Peterson
Richard F. O'Neill
Patrick B. Klein
NEVILLE PETERSON LLP
*Counsel for Plaintiff*
One Exchange Plaza
55 Broadway, Suite 2602
New York, NY 10006
(212) 635-2730
jpeterson@npwny.com

Dated:  October 15, 2021

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: HON. RICHARD K. EATON**

---------------------------------------------------------------------X

ME GLOBAL, INC.                            :
                                           :
        Plaintiff,                        :
                                           :
        *v.*                              :        **No. 19-cv-00179**
                                           :
UNITED STATES,                             :
                                           :
        Defendant.                        :

---------------------------------------------------------------------X

## <u>CERTIFICATE OF COMPLIANCE</u>

        Pursuant to the U.S. Court of International Trade Standard Chambers Procedures, and in reliance upon the word count feature of the word processing program used to prepare the instant Memorandum, I, Richard F. O'Neill, of Neville Peterson LLP, who is responsible for the instant Memorandum, certify that it contains 7,649 words.

                                      Respectfully submitted,

                                        /s/ Richard F. O'Neill
                                            Richard F. O'Neill